[Civ. No. 12685. Second Appellate District, Division One.— March 26, 1941.]

WILLIAM ELLIS LADY, as Special Administrator, etc., Respondent, v. MARY E. BARRETT et al., Appellants.

Robert R. Ashton and Cameron B. Aikens for Appellants.

William Ellis Lady, *in pro. per.*, for Respondent.

THE COURT.—This is an appeal from a judgment, based upon a verdict which the court directed the jury to enter in favor of the plaintiff. Hs, as special administrator of the estate of Mary Barrett, Sr., had brought the action for

possession of certain personal property held by appellant, Mary E. Barrett, executrix of the estate of Patrick C. Barrett. Joined as defendants were Mary E. Barrett and Alice G. Barrett, individually, and they also appear herein as appellants. However, as a matter of convenience we shall discuss this appeal as though presented solely by a single appellant, the executrix.

The property in question consists of four $5,000 bonds of the United States, which were payable August 1, 1918, and twenty-one checks in the amount of $150 each, representing interest falling due upon the bonds, at quarterly periods, beginning November 1, 1912, and ending August 1, 1918, excepting two checks which normally would have been issued on February 1, 1916, and May 1, 1916. The total value of these securities is $23,150.

All the bonds and checks were found by Mary E. Barrett and her sister Alice among the effects of their father, Patrick C. Barrett, within thirty days after his death at Claremont, California, on November 10, 1938. Each bond is registered and recites that ''The United States of America are indebted to Mrs. Mary Barrett, or assigns, in the sum of Five Thousand Dollars.'' On the reverse side appears a form providing for an assignment. A notation specifies that the execution and acknowledgment of an assignment when not made at the Treasury Department, must be before a United States judge or other named official of the government. Each check recites that at the date thereof the payee named in the body of the check is the registered owner of bonds of the ''3% Loan of 1908–1918'', amounting to $20,000, and is payable ''to the order of Mrs. Mary Barrett'', referred to during the hearing of this case as Mary Barrett, Sr.

Mrs. Barrett died December 12, 1912, and the issue in this trial, held twenty-eight years later, was the ownership of these uncashed securities. Do they belong to the estate of Mary Barrett, Sr., or do they belong to the estate of Patrick Barrett, who was in possession of them at the time he passed away? It will be observed that the checks are negotiable; the bonds, assignable. Because the bonds were never assigned in writing the court apparently concluded that they have always remained the property of the estate of Mary Barrett, Sr. This, in fact, is the argument advanced by respondent in support of the judgment and of the withdrawal of the case from the jury's consideration. ■ That the

respondent, however, had little confidence that this action directing a verdict was warranted on the evidence then before the court, appears from the fact that he has felt called upon to state in his brief, as proven facts, circumstances of which the court below was not advised, according to the record, and incidents which were not brought out in evidence. This, of course, is reprehensible practice on the part of counsel, and in our consideration of the appeal we have disregarded these statements, covering six or seven pages of respondent's brief.

Appellant contends that the bonds and the interest checks belonged to Patrick under the presumption that what he possessed at the time of death he owned (Code Civ. Proc., sec. 1963, subd. 11), and declares that any other theory ignores the presumption ''That a person is innocent of crime or wrong'' (Code Civ. Proc., sec. 1963, subd. 1). The theory of appellant is that the bonds were given to Patrick by his mother, and she contends that a gift or assignment by parol may be made of a registered bond, citing *In re Stockham's Estate* (193 Iowa 823 [186 N. W. 650, 22 A. L. R. 765]); in which the court recognized as valid the transfer of United States registered bonds made in writing before an official other than one of those mentioned on the bond, and stated ''Many obligations and choses in action, such as notes, bonds, bank certificates, insurance policies and certificates of stock have been held to be the proper subject of a gift without the formality of a written assignment''. (See, also, *Herbert, Exr., etc.,* v. *Simson,* 202 Mass. 480 [108 N. E. 65, L. R. A. 1915D, 733, note]; *Talbot* v. *Talbot,* 32 R. I. 72 [78 Atl. 535, Ann. Cas. 1912C, 1221, 1235, note]; *Re Estate of Connell,* 282 Pa. 555 [128 Atl. 503, 38 A. L. R. 1362, note].) A contrary view as to presumption of ownership where no written assignment has been made is expressed in *Atchley* v. *Rimmer,* 148 Tenn. 303 [255 S. W. 366, 30 A. L. R. 1481], and *Gano* v. *McCarthy,* 79 Ky. 409, strongly relied upon by respondent in his brief.

When Mrs. Barrett died she was residing at Green River, Wyoming, which had been her home for almost fifty years. She was a widow, and her heirs at law were her daughter Mary, known as Mayme, and her three sons, James, Patrick and Joseph Edward, known as Ed. James is the sole survivor of these four children. He was born in Green River in the year 1870, and has always resided in Wyoming. He

was appointed administrator of his mother's estate in Wyoming May 19, 1938, and approximately a year later respondent, upon James' nomination, qualified as Special Administrator for the estate in California. Mary had died in 1930. Ed died in 1934, and Patrick passed away, as we have stated, on November 10, 1938, six months after James' appointment. At the time of his death Patrick was staying with his two daughters, Mary E. and Alice G. Barrett, at Claremont, having arrived there from Wyoming a fortnight previously.

It appeared at the trial that Mary (or Mayme) had been appointed administratrix of her mother's estate by the superior court in Wyoming in 1913, a position from which she was removed, through proceedings instituted by James a year or so later, on the ground that she had not been duly and regularly appointed. At that time Tom Whitmore, not one of the family, was appointed to succeed her, and at a later date, in 1923, Mayme was reappointed administratrix of the estate of Mary Barrett, and continued as such until her death in 1930. At no time did she or Mr. Whitmore, as representative of the estate, list the bonds or checks as assets thereof, nor did either of them, so far as the record shows, bring an action to secure possession of these securities, or cash any of the checks which were issued after Mrs. Barrett's death. The two missing quarterly checks for 1916 have not been accounted for in any way, and it does not appear that Mayme Barrett ever attempted to exercise any ownership over the checks or bonds, either as a part owner or as representative of her mother's estate.

Owing to the fact that, with the exception of James, all the members of the family who were living at the time of Mrs. Barrett's death have died, and because of the restrictions imposed by the rules of evidence upon the admission of statements of deceased persons, the appellant's claim of ownership is based largely upon presumptions and inferences which, under section 1957 of the Code of Civil Procedure, are declared to be evidence. Section 1959, Code of Civil Procedure, defines a presumption as "a deduction which the law expressly directs to be made from particular facts". The appellant does not rely upon any conclusive presumption as specified in the code, but does contend that certain other presumptions weigh strongly in her favor, and it may be noted that while section 1962 of the Code of Civil Procedure

specifies various conclusive presumptions, section 1963 provides that all other presumptions may be controverted, using the language, "All other presumptions are satisfactory, if uncontradicted. They are denominated disputable presumptions, and may be controverted by other evidence." Among these disputable presumptions that the appellant calls to her aid are the following: "That a person is innocent of crime or wrong; . . . That a person takes ordinary care of his own concerns; . . . That a thing delivered by one to another belonged to the latter; . . . That things which a person possesses are owned by him; . . . That a person is the owner of property from exercising acts of ownership over it . . . ; That private transactions have been fair and regular; . . . That the law has been obeyed."

At the trial only three witnesses appeared, James Barrett, as the sole witness for the respondent, and Mary E. Barrett and her sister Alice, as witnesses for the appellant. James testified that after his wife died in 1935 his brother Patrick lived with him, except for short periods of a month or two, until October, 1928, when he came to Claremont; that he paid no rent, was not employed and, so far as James knew, had no property. He stated that his mother could not read or write and maintained friendly relations with all her children; that following his appointment as administrator in 1938 he learned from the Treasury Department of the United States of the existence of the bonds and checks, and later that they were in the possession of his nieces, Mary and Alice; that he made demand upon them for the securities, which demand was refused. He testified on cross-examination that he was on friendly terms with his sister, although there was litigation between them ending in one or two cases going to the Supreme Court of Wyoming, including one which he brought involving other members of the family also; that he had no idea that the bonds were in existence until he heard from the Treasury Department, but that in 1931, after Mayme had died, he was present at the opening of her lockbox in a Wyoming bank, and that he heard read from a list of contents an interest check of the United States government, payable in the sum of $150 to Mrs. Mary Barrett; that at that time he was looking for the bonds. He stated, under cross-examination, that in 1913 he had Mayme removed as administratrix because of misconduct and neglect; that "she was not

probating anything that belonged to my mother. She was hiding it out." At this juncture counsel for appellant read to the jury excerpts from the decision of the Wyoming Supreme Court, from which it appeared that the ground of removal was not misconduct or neglect, but error on the part of the lower court in appointing Mayme when she had not applied for appointment. James also testified, on cross-examination, that while Patrick was living with him he, Patrick, owned a house in Green River, willed to him by Mayme, which he had rented. Appellant claims that because of contradictions in the testimony of this witness, which may be noted in the foregoing recital, a jury should have been permitted to pass upon the question of his credibility. Alice testified that she had never seen the bonds, meaning the bonds as distinguished from checks, before the death of her father, but she did testify that in the summer of 1918, when she was about fifteen years old, her Aunt Mary (or Mayme) sent her to the post-office at Green River, Wyoming, for the mail; that she returned with the mail and gave it to her aunt, who looked through it and then handed her a letter, which she described as "a long letter, a long envelope", which was addressed to Mrs. Mary Barrett. This envelope, she stated, she gave to her father, that she saw the contents, "It was an interest check from the United States Government, three per cent loan, is what I remember on it, to Mrs. Mary Barrett." The amount of the check, this witness testified, was $150.

Mary E. Barrett testified to finding the securities in her father's suitcase in his bedroom at Claremont, and offered to prove, by documentary evidence, as well as by various conversations which she overheard between Patrick and his sister Mayme, that the latter, while she was acting as administratrix of her mother's estate, made statements that Patrick had the bonds, and that they were in his hands. She also undertook to prove, by conversations which she overheard between Patrick and Mayme, that they were agreed that it would be unwise for Patrick to let James know about the existence of these bonds for fear he would start another lawsuit; also, that during her father's lifetime she had many conversations with him concerning the bonds, beginning in the year 1920, and continuing until his death, in which he told his daughter that he did not intend to cash the bonds, relating his experience with a bank which went broke, caus-

ing him to lose all his money; that he was not going to have that happen again; that he was going to keep the bonds intact. The proffered items of evidence, affidavits and conversations, were refused admission by the trial judge, who also ruled out an attempt to show that this action is barred by the statute of limitations, section 361 of the Code of Civil Procedure, which in the appellant's answer was set up as a defense. He had stated at the opening of the case, "I am not going to allow the defense of the statute at all", and he adhered to this determination. Appellant contends that error arose here and also in the court's refusing to admit the various conversations of deceased persons showing state of mind, particularly the statements that would tend to explain Patrick's reticence concerning the bonds and his failure to convert them into cash, claiming that these statements fall within the rule referred to in *Bridge* v. *Ruggles*, 202 Cal. 326 [260 Pac. 553], where it is said at page 330, "It is a well-settled exception to the hearsay rule that when the belief, feeling, and mental state of a person at a particular time is material to the issue, evidence of such person's declarations indicative of his then mental state are admissible, and it is immaterial whether or not such declarations were made in the presence of the adverse party or what the character of the litigation may be so long as evidence of such state of mind is material to the issue." (Citing *Adkins* v. *Brett*, 184 Cal. 252, 255, 256 [193 Pac. 251], and other cases.) (See, also, *Estate of Carson*, 184 Cal. 437 [194 Pac. 5, 17 A. L. R. 239], and interesting discussion of the rule by Professors Maguire and McBaine in their respective essays appearing in 38 Harv. L. Rev. 709 and 19 Cal. L. Rev. 231, 367.)

We deem it unnecessary to determine the many questions raised in the appellant's brief upon the correctness of rulings concerning the admission of evidence, in view of our conclusion that under the circumstances of this case the evidence was sufficient to warrant its consideration by a jury in determining the ownership of these bonds and checks. This is so particularly as regards the testimony of Alice Barrett relative to the delivery from Mayme to Patrick, by the hand of Alice, of the interest check in 1918. On this point appellant argues, "It was shown that Mayme Barrett delivered one of the checks in question to Patrick C. Barrett, and there is a strong inference that she delivered the others.

How else could he have secured possession of them? It was likewise shown that had the property in question been a part of the estate of Mary Barrett, Sr., Mayme Barrett, as an heir of that estate, would have been directly benefited in a pecuniary manner by its addition to the assets of that estate. Thus the fact of her having delivered the check to Patrick C. Barrett was strong evidence that the check belonged to him. By statute section 1963, sub. 8 of the Code of Civil Procedure of the State of California has provided that it is presumed 'that a thing delivered by one to another belonged to the latter'. From another standpoint the delivery, in itself, is entitled to consideration, in that if the bonds and checks were known by Mayme to be part of the assets of the estate of Mary Barrett, Sr., Mayme would be a wrongdoer and guilty of a crime in delivering the check to Patrick. Under the circumstances the Court and jury were required by law to presume that the law has been obeyed (Section 1963, Subdivision 33 of the California Code of Civil Procedure); that Mayme Barrett was innocent of crime or wrong (Section 1963, Subdivision 1 of the California Code of Civil Procedure); and likewise that she was 'taking care of her own concern' in delivering the checks to Patrick. (Section 1963, Subdivision 4 of the California Code of Civil Procedure.) For she certainly would not have been 'taking care of her own concern' if she delivered property to Patrick that belonged partially to her as an heir of her mother. The trial court, in completely ignoring the existence of these presumptions, created reversible error.''

Respondent calls our attention to the fact that immediately after a motion for a directed verdict was made in behalf of the plaintiff a similar motion was made in behalf of the defendants in this case, and claims that by reason of that ''the court had an absolute right to make the order since the effect thereof was to withdraw from the jury the question of whether plaintiff and respondent was entitled to recover or whether defendants and appellants were entitled to recover.'' This view, however, is not supported by the authorities. (See *Parker* v. *James Granger, Inc.,* 4 Cal. (2d) 668, 679 [52 Pac. (2d) 226].)

Without encumbering the record with the multitudinous pronouncements by our appellate courts defining the rule under which a directed verdict may be given, we content our-

selves with a reference merely to one of the latest and most complete discussions of that subject as it appears in *Estate of Lances*, 216 Cal. 397, 400 et seq. [14 Pac. (2d) 768]. Under the rule there set out, we believe that this case should have been submitted to the jury.

Judgment is reversed and the cause remanded for a new trial.

Respondent's petition for a hearing by the Supreme Court was denied May 22, 1941.